Amy Lynn SAVILLE et al.,
Plaintiffs,

v.

Dr. Richard TREADWAY, etc., et al.,
Defendants.

Civ. A. No. 6969.

United States District Court,
M. D. Tennessee,
Nashville Division.

March 8, 1974.

Walter C. Kurtz and Gordon Bonnyman, Legal Services of Nashville, Nashville, Tenn., for plaintiffs.

C. Hayes Cooney, Asst. Atty. Gen., Nashville, Tenn., for defendants.

Before PHILLIPS, Chief Circuit Judge, GRAY, Chief District Judge, and MORTON, District Judge.

PER CURIAM.

This case was instituted on behalf of the approximately 1100 patients of Clover Bottom Hospital and School for the Mentally Retarded, a mental health facility operated by the State of Tennessee, and alleges constitutional violations in certain of defendants' admission and operational practices. The case is now before this three-judge court for consideration of that portion of the complaint which seeks to have T.C.A. §§ 33–501(1) and (2), which sets forth patient application procedures, declared unconstitutional and its operation enjoined.

Under the Mental Health Law of 1966, a Department of Mental Health for the State of Tennessee was created to administer the state's seven existing mental health facilities and any additional institutions which might be subsequently established. Five of these were denoted as institutions for the mentally ill and two as institutions for the mentally retarded. Each institution is a body politic and corporation in its own name and is managed, governed and controlled by the Commissioner of Mental Health. The Commissioner, in turn, appoints a superintendent of each institution who is the managing officer of the institution.

Chapter V of the Tennessee Mental Health Act, T.C.A. § 33–501 *et seq.*, establishes application procedures for admission to institutions for the mentally retarded (§ 33–501); provides for the detention of patients in an institution until discharged by order of the Commissioner, Superintendent, or court (§ 33–506); vests exclusive control and custody of the patient in the Commissioner and Superintendent (§ 33–507); and provides that the patient may be granted a conditional or absolute discharge by the Superintendent in accordance with the rules and regulations of the Commissioner (§ 33–510). The Superintendent may grant a conditional discharge for the trial placement of patients in the community. However, if the Superintendent determines that the welfare of the patient or the community requires the patient's re-institutionalization, the conditional discharge may be cancelled. An absolute discharge may be granted a patient who has been on a conditional discharge for a year or more and who has continued to demonstrate a fitness to remain on release. Furthermore, whenever, in the judgment of the Superintendent, the condition of a patient is such that he may safely be released to take his place in society, he may be granted an absolute discharge upon a showing that the family or community agencies can provide whatever degree of supervision the patient may need.

In addition to the above, T.C.A. § 33–307 provides that any patient "may be held under such restraint and given such standard treatment including surgery as may be necessary for the welfare of the patient or resident in accordance with the terms" of the Mental Health Law.[1]

The challenged portions of § 33–501 provide that, subject to the availability of suitable accommodations, the Superintendent may admit a mentally retarded individual to a hospital and school under any of the following procedures:

"(1) Application to the superintendent by the parent or guardian or person having lawful custody of a mentally retarded minor or by the guardian of a mentally retarded adult or by a mentally retarded individual eighteen (18) years of age or over on his own behalf.

"(2) Application to the superintendent by the spouse, adult child or other close adult relative of the individual, or by any health or by any public welfare officer, or school official, with the consent of the individual or his parent, guardian or person having lawful custody of him, accompanied by a certificate of a licensed physician or a licensed physician and a licensed psychologist that he has examined the individual within thirty (30) days of the date on which admission is sought and that he is of the opinion that the individual is mentally retarded and is in need of care and treatment in a developmental center."

In addition, though not contested here, § 33–501(3) provides:

"(3) If the individual or his parent, guardian or person having lawful custody of him does not consent to an application to the superintendent for admission, an application for the admission of the individual may be filed by any interested, responsible adult in the county court of the county in which the individual resides or may be found. . . ."

---

1. Surgery may be performed only if the consent of the patient or the parent, guardian, spouse, or adult next of kin is first obtained.

Thus it can be seen that a parent, guardian, or person having legal custody of a mentally retarded minor or the guardian of a mentally retarded adult may without restriction place the individual in Clover Bottom Hospital and School with release available only upon consent of the Superintendent of the institution or the Commissioner of Mental Health, or through court proceedings.[2] The period of institutionalization is potentially of lifelong duration, and in any case might continue long after the parent or other person who initiated application had died.

■ The Fifth Amendment to the Constitution of the United States made applicable to the states by the Fourteenth Amendment provides in part that no person shall be deprived of life, liberty or property without due process of law. The procedures required by due process vary with the nature of the case, and the more serious the deprivation the more extensive the procedural safeguards which must precede its imposition. *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Cafeteria Workers v. McElroy,* 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951). Thus as provided by the Sixth Amendment, a person accused of a crime enjoys, among others, the right to a speedy and public trial before a jury of his peers, the right to be informed of the nature and cause of the accusation, the right to confront and cross-examine witnesses, compulsory process for obtaining witnesses, and the assistance of counsel.

■ In deciding the issues presented by this case, the court is not unmindful that the services furnished to mentally retarded individuals by the State of Tennessee are voluntarily performed at great public expense. Furthermore, the state is to be commended for its efforts in mental rehabilitation. However, where individual liberty is at stake to the extent it is in the instant case, it is absolutely essential that such confinement be preceded by adequate procedural safeguards.[3] Given the possible conflicts of interest between a mentally retarded child and even a parent, it seems obvious that the "voluntary" commitment procedures of T.C.A. § 33–501 fall far short of those required by due process.[4]

The court therefore holds T.C.A. § 33–501(1) and (2) to be unconstitutional as a violation of the due process clause of the Fourteenth Amendment, and an order shall issue enjoining further hospital admissions pursuant to the provisions of this statute.

■ The defendants have insisted that this court should abstain based on the doctrine of comity between the federal and state courts. However, in view of the fact that the statute in question is not fairly subject to a constitutional interpretation, abstention would be improper. *Zwickler v. Koota,* 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

■ Defendants further assert that since the relief sought in this case is similar to that which might be reached in a state habeas corpus proceeding, the doctrine of exhaustion of remedies should apply. However, since the patients of the subject institution are not in custody pursuant to the judgment of a state court, 28 U.S.C. § 2254, and the rights of future as well as present patients are involved, the court declines to treat this action as one appropriate for federal habeas corpus relief.

2. Under T.C.A. § 33–316, release may be obtained by means of a writ of habeas corpus if the court issuing the writ determines that the person seeking release is not mentally retarded or mentally ill, as the case may be.

3. *See Lessard v. Schmidt,* 349 F.Supp. 1078 (E.D.Wis.1972).

4. Although information appears in the record as to the procedures following admissions, no rules and regulations promulgated by the Commissioner implementing the admission statutes were filed in this cause.

MEMORANDUM
and
*Findings of Fact*

MORTON, District Judge.

On September 18, 1974, a consent agreement and order was entered in this case signed by counsel for all parties. This order provided that the parties had agreed, inter alia, that mentally retarded persons admitted to Clover Bottom Developmental Center, hereinafter called the Center, have a right to proper medical care and physical restoration and to such education, training, and guidance as will enable them to develop their individual ability and potential to the fullest possible extent, no matter how severe the degree of disability; and that such persons have a right to an environment least restrictive to their liberty in that individual liberty is to be restricted to no greater degree than is necessary and appropriate to provide habilitative services. The order also required respondents to submit a plan to the court for the implementation of the aforesaid rights within four months. The plaintiff, or the court, could then move for a hearing limited to the adequacy of the proposal within eight months following its submission. All other issues were dismissed with prejudice by agreement.

On January 20, 1975, the respondents filed a document entitled "Clover Bottom Developmental Center Plan of Action" with exhibits (hereinafter called the Plan). The Plan and its exhibits have been made a part of the record.

In March, 1975, plaintiffs filed a motion contending that the Plan failed to implement the rights declared in the agreed order of September 18, 1974. A hearing was held to determine the adequacy of the Plan.

The Plan is a comprehensive document that presents, both in narrative form and in diagrams, the overall program by which respondents endeavor to attain two major goals: provision of individualized habilitative care and training programs for Center residents, and creation of the least restrictive physical and social environment. Each chapter of the Plan is comprised of three major sections: (1) a brief historical description of past conditions; (2) a brief description of current conditions and efforts; and (3) the plan for upgrading the quality of care and training while providing the least restrictive environment for the Center's residents.

A summary of the Plan is as follows:

(a) *Resident Population and Financial Support:* The Center's population has decreased from 1,483 residents in 1968, to a total "on-grounds resident population"[1] of 972 as of December 31, 1974. The Plan provides that the total "on-grounds resident population" will be further decreased to between 600 and 700 residents over the next three-year period. The commitment of respondents to provide improved care and training for Center residents is likewise reflected in the increasing financial support and staff provided in the past few years whereby expenditures for residential care and training have increased from $5.39 per resident per day in 1965–66, to approximately $33.50 per resident per day in fiscal year 1974–75. Total expenditures for the Center have increased from $2,586,861 in fiscal year 1965–66, to a projected total expenditure of $11,-380,000 in fiscal year 1974–75. Likewise, the total number of personnel positions has increased from 829 in fiscal year 1969–70, to a projected total of 1,201 for fiscal year 1974–75. The increases in financial support and personnel positions have occurred during the same period that the "on-grounds resident population" has decreased to the point where the resident population is significantly smaller than the number of established personnel positions. Also, a significant majority of the residents are now persons of moderate to profound levels of retardation with other handicapping conditions.

1. "On-grounds resident population includes full-time residents and individuals on night care and short-term training admissions.

(b) *Individualized Care and Training:* In June, 1973, an effort was initiated to evaluate each resident and develop personalized program plans. By December, 1974, approximately 950 residents have been evaluated and staffed by interdisciplinary teams and the process of annual review of residents' personalized programs had begun. A system for recording program needs and progress data of residents has been established. This system includes provisions for identifying responsibility and accountability in the training and care programs. The program of staffing a resident by an interdisciplinary team includes establishment and maintenance of up-to-date objectives and goals for each resident which are established with the resident's participation. Respondents anticipate that by September, 1976, the Tennessee Department of Education will assume responsibility for most residents presently enrolled in on-campus educational programs and that the remaining residents will receive on-campus special educational services.

(c) *Social Programs:* Recreational services are provided to the residents seven days a week on both individual and group bases. A work activities program is presently offered on a limited basis; however, the Plan provides for the addition of facilities and personnel for expansion of this program. Residents are afforded a wide range of professional services which include: (1) religious services, both on and off the grounds of the Center, (2) social services to encourage close family relationships between residents and their families, (3) psychological services to determine the levels of intellectual, social and personal functioning as an aid in planning their individualized programs, and (4) speech pathology and audiology services. In addition, a Foster Grandparent Project [2] is in operation at the Center. Thirty "foster grandparents" currently participate in this project and provide sixty-two residents with personal and individualized attention. The objective of this project is to meet some of the physical and emotional needs of institutionalized infants and children through a sustained one-to-one relationship.

(d) *Medical Services:* In 1966, the medical staff consisted of eight physicians and the Superintendent and Clinical Director. The medical staff has been expanded and now consists of the Assistant Superintendent for Medical Services, three full-time physicians, one part-time physician, four physician assistants, and three physicians on duty in the evenings and weekends to provide twenty-four hour, seven-day-a-week medical coverage for residents. Emergency medical services are provided in the Center by a full-time and contracted staff as well as through contracts with community hospitals. Additionally, eight qualified consultants are contracted to provide specialized services not otherwise available through the Center's resources. Provisions have also been made to meet employee health needs. Annual physical examinations are now mandatory for all residents and employees.

The professional nursing staff has increased since 1969 from four registered nurses and eleven positions to seventeen registered nurses and nineteen positions in 1974. Similarly, there has been an increase since 1969 from two licensed practical nurses and fifteen positions to eleven licensed practical nurses and twenty-three positions currently.

In 1969, the function of the residential unit staffs was basically one of providing custodial and medical care. This function has now changed and residential unit staffs have assumed a care and training role. Currently, the only on-campus medically oriented unit is the Infirmary which provides intensive medical care for residents who are acutely ill and in need of constant medical moni-

2. The Foster Grandparent Project is one of 137 such programs in the nation administered by ACTION, Washington, D. C. Senior Citizens, Inc. serves as the local sponsor of the program.

toring.[3] These changes are an outgrowth of a reorganization effort initiated in 1966 in the establishment of separate divisions for clinical, administrative and human development functions. In this approach to care and training, the unrelated administrative responsibilities have been removed from physicians and medical nurses.

Approximately eighty residents are now involved in daily physical and occupational therapy programs. Therapy evaluations are accomplished weekly for residents assigned to the Total Care Division.[4] The physical therapy staff actively participates in the Center's employee training and development program by providing a minimum of two hours per week instruction. This phase of the training and development program provides employees with on-the-job training and classroom instruction. Since January 1, 1975, two additional hours of instruction concerning physical therapy have been included in the ongoing employee training program. Occutional therapy instruction is projected for inclusion in the employee training program.

(e) *Pharmacy and Dental Services:* The Center is currently in the initial stage of implementing the "modified unit dose dispensing system" for administration of medication. This system of medication distribution calls for the pharmacy unit to supply individual medication doses at the proper time. Administrative and clerical records will be furnished by the pharmacy with the individual doses and each dose will be identified with the name and strength of the medication and the name and batch number of the manufacturer. This dispensing system is a departure from the traditional approach of maintaining a medication and drug stock in each residential unit. The new system is expected to significantly reduce the potential of medication misuse or abuse. Further, the new system reduces the administrative and clerical requirements for residential unit staffs.

In addition to providing a program of dental care for the Center's residents, plans have been formulated to implement an active preventive dental program wherein the direct care staff will receive instruction in proper oral hygiene principles. The direct care staff will then be responsible for training residents in these principles and encouraging self-care efforts among the residents.

(f) *Physical Plant and Facilities:* The original buildings at the Center were constructed during the early 1920's to serve as dormitories. The architectural features of these buildings were in keeping with the then existing philosophy of providing custodial care for retarded persons considered "incurable" and best hidden away in an institution. The Plan reflects many changes in the physical plant since the Center was opened in 1923. Buildings have been renovated and put to new uses. A cafeteria has been constructed and a long-range facility construction plan has been developed. Presently, four cottages are under construction that will house twenty-four residents each, and extensive renovation is underway in some of the older residential buildings to provide a more homelike or normalized environment. The renovation plans include painting, installation of improved lighting, installation of shower stalls and partitions between toilets, removal of security bars, installation of air-conditioning, and new furniture.

3. In most instances, residents of the Infirmary program are assigned to some other living unit and will return to their units when the need for intensive medical care has been overcome.

4. The Total Care Division provides care for multiply handicapped residents. Evaluations for residents outside the Total Care Division are made as requested by other Divisions. The supervisory staff of the Total Care Division is composed of registered nurses and licensed practical nurses in order to insure delivery of health care for non-ambulatory, profoundly and severely multiply handicapped residents.

In contrast to the earlier practice, space is now provided for residents to store their personal belongings. In the dormitory units there are now ninety-nine closets available, two hundred new dressers, storage areas under residents' beds, and 140 feet of wall lockers. The long-range construction plan calls for the demolition of ten or more old buildings and further remodeling of existing buildings plus new construction.

(g.) *Deinstitutionalization of the Social Environment:* Residents are now allowed on-campus mobility when they are capable of not getting lost. Some residents are permitted to leave the campus for unescorted shopping trips, church attendance and recreational activities. Since 1968, male and female residents have been able to socially interact with minimal restrictions. Residents now receive properly fitting clothes and restrictions are not imposed on the receipt or initiation of mail by residents. Restrictions have been removed from telephone usage by residents and training is provided for the proper use of the telephone. Further, residents now participate in many special community events.

The Tennessee Department of Mental Health has promulgated specific instructions and safeguards for the exercise of residents' rights. These instructions range from compliance standards under the Fair Labor Standards Act concerning work by residents, to the protection of residents' rights during their participation in research projects. Several agencies are permitted complete access to the Center for the purpose of assuring the protection of residents' rights.

As previously noted, section (a), *supra*, the Plan projects reduction in the size of the on-grounds resident population over the next three years to between 600 and 700 residents. The Plan's proposed on-grounds resident population is anticipated to be composed primarily of those persons with severe and profound retardation and possibly other handicapping conditions. In order to carry out this program of deinstitutionalization, a community resources development project has been initiated. The Center has assumed overall responsibility under this project for the provision and development of a broad array of services, including both institutional and community programs, that are presently available or planned within the Middle Tennessee area. Four staff offices have been organized under the Center to facilitate the coordination and development of deinstitutionalized services.[5] By way of illustration, the Plan indicates several programs are currently available in the Middle Tennessee area that include: fifteen adult activities programs serving over three hundred clients; twelve residential programs serving over one hundred and fifty clients; six "day-training" programs for children that serve over two hundred and thirty-five clients; and two sheltered workshops serving over two hundred and fifty clients. Additionally, social service workers assigned to community resources projects are providing services to some one hundred and eighty clients in the Middle Tennessee community.

Plaintiffs contend that the Plan fails to return a large enough number of present Center residents to the community at a sufficiently expeditious rate. However, considering the testimony of Mr. David B. Ray, Assistant Commissioner of Mental Health for Mental Retardation, Tennessee Department of Mental Health; Mr. Charles McElroy, Director of the Regional Office to serve Middle Tennessee in the development and administration of the community mental retardation program; and that of Mr. Alan Bullard, Director of Programs for the Retarded, Tennessee Department of Mental Health, the court finds, considering the various factors involved,

---

5. The four staff offices are: (a) the Middle Tennessee Regional Office staff, (b) the Community Social Services staff, (c) the Diagnostic and Evaluation Services staff, and (d) the Family Training and Respite Care Services staff. The functions and responsibilities of these staff offices are described on pages 65–67 of the Plan.

including funding, training, and development of services the Plan proposed by the respondents for providing community services to residents at the Center is adequate to meet the right to receive habilitative services in the least restrictive alternative as set forth in the agreed order of September 18, 1974.

The budget request by the Tennessee Department of Mental Health from both the state legislature and the federal government appears to be adequate to implement the first year phase of the Plan. Although the state legislature failed to appropriate funds for the full budget request, the court finds that the budget approved by the state legislature will allow respondent to substantially implement the first year phase of the Plan. For example, in replies to post-hearing interrogatories, respondent indicates that available state and federal funding will be sufficient to develop community services for approximately fifty-one additional Center residents. Placement of these residents will leave the deinstitutionalization program with thirteen fewer placements than the one hundred and twenty-one placements projected by the Plan. The court finds no suggestion that respondent has failed to seek adequate funding in good faith. Additionally, the court finds that the available funding is adequate to ensure that substantial progress will be made toward meeting the first year projections in the Plan.

*Conclusions of Law*

In the agreed order signed by counsel for all parties in this case and entered on September 18, 1974, it was concluded that (1) mentally retarded residents admitted to the Center have a right to habilitative services as defined in said order, and (2) such mentally retarded citizens have a right to receive habilitative services in the least restrictive alternative. The only issue before the court at this time, as agreed by the parties, is whether respondent's Plan is adequate to meet the aforesaid rights. The court is of the opinion that the Plan is adequate.

### ORDER

In accordance with the Memorandum contemporaneously filed, it is Ordered that the exceptions of the plaintiffs as set forth in their motion of March 5, 1975, to the January 20, 1975, Plan of respondents are denied and disallowed.

### ORDER

In accordance with the provisions of the per curiam opinion and orders heretofore entered in this case on March 8, 1974, requiring that proposed residents at Clover Bottom Developmental Center be afforded basic process of law prior to their voluntary admission thereto, the court hereby Orders:

(1) No person shall be admitted to Clover Bottom Developmental Center except in accordance with this order or in compliance with the orders and adjudications of courts of competent jurisdiction.

(2) No person of 16 years [1] or older classified as "border line" or "mildly retarded" shall be admitted under the procedures set out in this order unless he or she, in a signed writing or document, consents thereto. In addition, signed written consents shall be obtained from all proposed residents 16 years of age or older who, in the collective opinion of the evaluating team, have the capability to understand the fact of proposed admission. Absent such consent, resort shall be had to the state courts for proper commitment.

(3) The admission procedures hereinafter set forth shall not be applicable to (a) "Respite Admissions" lasting no more than forty-five (45) days nor to (b) "Emergency Respite Admissions" lasting no more than forty-five (45) days provided an informal review of said admission is carried out by the Admissions Board at Clover Bottom Developmental Center within seven (7) days after said admission, and (c) "Short-

---

1. Compulsory school age in Tennessee is 16 years of age. T.C.A. § 49–1708.

Term Training Admissions" lasting no more than six (6) months.

A "Respite Admission" as used herein means a voluntary admission authorized solely for the purpose of providing a respite for the person or persons having responsibility for the care, custody and control of the resident.

An "Emergency Respite Admission" as used herein means an admission caused by an emergency situation resulting in the temporary inability of the person or persons having care, custody and control of the resident to provide proper care, custody and control.

A "Short-Term Training Admission" as used herein means an admission to Clover Bottom Developmental Center under a written agreement wherein it is agreed in advance that said Center will teach the temporary resident how to perform a certain function or functions for a specified period of time and at the conclusion of that time the person having care, custody and control of the resident shall withdraw the temporary resident from the Center. An admittee shall be discharged at the end of the training period (not to exceed six (6) months) and may not be readmitted except through the procedures applicable to regular residents.

The procedures hereinafter set forth shall also not be applicable to applications for outpatient care of persons at Clover Bottom Developmental Center.

(4) The present intake procedure or procedures for gathering information regarding proposed residents, testing the proposed residents, conferring with the proposed residents and their families and guardians, and presenting all the foregoing information together with the recommendations of the various disciplines involved in obtaining the information to the Admissions Board of the Center is hereby authorized to continue.[2] For cases wherein the Admissions Board of the Clover Bottom Development Center recommend admission to said Center,

there is hereby established a review board to be known as the Admissions Review Board which shall receive the recommendations for admission of proposed residents from the present Admissions Board. The said Admissions Review Board shall be composed of three (3) members, namely: (a) a representative from the Tennessee Association for Retarded Children and Adults, Inc., (b) a person meeting the academic qualifications for a Developmental Center Superintendent as set forth in T.C.A. § 33–203, and, in addition, having two (2) years' experience in the care and treatment of mentally retarded persons, and (c) a representative from the Development Disabilities Council. One (1) of said three (3) Board members shall be a parent of a mentally retarded person not confined to a Developmental Center in Tennessee. The initial three (3) members of the Board shall be selected by the President of the Tennessee Association for Retarded Children and Adults, Inc. after consultation with an official of the Tennessee Department of Mental Health and the plaintiffs' attorneys. This Board shall act only by majority vote.

Upon receipt by the Admissions Review Board of a recommendation by the Admissions Board that a proposed resident be voluntarily admitted to Clover Bottom Developmental Center for an indefinite period of time, the Admissions Review Board shall give written notice at least fifteen (15) days in advance to the proposed resident and the person or persons who made application for his or her voluntary admission thereto of a hearing to be held on a date certain to review the recommendation of the Admissions Boards and decide whether or not the proposed resident should be admitted to the Center. The proposed resident shall be advised that he or she may retain private counsel of their own choice or, absent such employment, said proposed resident shall be represented at the hearing by the Citizens Advocacy Coun-

---

2. A summary of the present intake procedure is described in the appendix to this order.

This appendix is a portion of an affidavit filed December 18, 1973.

cil for the Developmentally Disabled, Inc., as advocate. Said counsel or advocate shall have access to all documents upon which the Admissions Board made its recommendation for admission prior to the hearing.

The hearing by the Admissions Review Board shall be conducted in an informal manner and the technical rules of evidence shall not apply. In addition to the proposed resident and the person or persons making application for voluntary admission of the proposed resident, the Director of the Diagnostic and Evaluation Center at Clover Bottom Developmental Center or his or her designee shall be entitled to be present and heard at each hearing. Upon reasonable request by the proposed resident or his advocate or counsel, the Admissions Review Board is authorized to call before it the person or persons who furnished information to the Admissions Board for questioning by the proposed resident or his advocate or counsel regarding the information they furnished said Admissions Board. Likewise, the representative of the Diagnostic and Evaluation Center of Clover Bottom Developmental Center who is present at the hearing and the person or persons making application for admission of the proposed resident may question said person or persons if they are called as witnesses before the Board. In addition, the proposed resident, his counsel or advocate, shall have the authority to request the Admissions Review Board to have further professional testing and evaluations of the proposed resident carried out prior to a final decision by said Board provided that such testing and evaluations shall be paid for by the person seeking admission if non-indigent. The Admissions Review Board shall record the oral testimony presented to it by tape recording or other suitable mechanical device which shall be transcribed in the event the proposed resident seeks judicial review of the action of the Admissions Review Board in the State courts. Said transcription shall be at the expense of the person seeking admission in cases of non-indigency.

At the conclusion of the hearing, or as soon thereafter as practicable, the Admissions Review Board will reach its decision on the issue of whether or not the proposed resident shall be voluntarily admitted to Clover Bottom Developmental Center. Its decision shall have as its primary consideration the welfare of the proposed resident. Its decision shall not be influenced by any benefits flowing from admission which may be received by the family, parents, guardian or representative of the proposed resident. The decision of the Board shall be in written form and reflect in reasonable detail the Board's findings regarding the severity of retardation of the proposed resident, the type of treatment which is appropriate for the proposed resident, the existence or non-existence of other feasible alternatives to admission to Clover Bottom Developmental Center, and the evidence upon which its decision is based, but this written decision need not amount to formal findings of fact and conclusions of law. Copies of the written decision of the Admissions Review Board shall be furnished to the Superintendent of Clover Bottom Developmental Center, the proposed resident, his or her counsel or advocate, and to the person or persons who made application for the voluntary admission of the proposed resident to Clover Bottom Developmental Center.

It is further ORDERED that as to persons who have been voluntarily admitted to Clover Bottom Developmental Center prior to March 8, 1974, and who have been within the last twelve (12) months re-evaluated by personnel at said Center and for whom individual treatment programs have been established, the Citizens Advocacy Council for the Developmentally Disabled, Inc. shall, within one hundred fifty (150) days from the date of entry of this Order, review the records of such persons whether they be considered to be of borderline, mild, moderate, profound or severe retardation, to determine only whether appropriate consideration has been given to the issue of whether other feasible alternatives exist for placement of such persons and may

request the Admissions Review Board to review the continued admissions of such persons on that issue in an informal hearing in the manner hereinbefore set forth, but no complete re-evaluation of such persons is required. That as to all other present residents of Clover Bottom Developmental Center who are presently undergoing re-evaluations and re-testings at said Center, the division evaluation teams shall consider the issue of whether other feasible alternatives to admission to said Center exists for those residents and shall include in their reports and recommendations a determination of that issue. These reports shall be furnished to the Admissions Review Board and said Admissions Review Board shall conduct an informal hearing in the manner hereinbefore set forth as to each such resident. At any of the foregoing hearings before said Board involving present residents of Clover Bottom Developmental Center, the said Center may be represented by the Chief of Social Services.

The decisions of the Admissions Review Board shall be subject to judicial review by the present or proposed resident, the person or persons who made application for the voluntary admission involved, and Clover Bottom Developmental Center in the manner now provided by State law for review by common law certiorari of board actions.

All voluntary admissions to Clover Bottom Developmental Center pursuant to the procedures hereinbefore set forth shall be carried out subject to the availability of suitable space for the proposed resident.

Any of the parties hereto may, at any time, seek amendment of the aforesaid plan upon motion duly filed in this court.

### APPENDIX

That the reasons for not admitting clients to Clover Bottom Developmental Center include:

(1) In suitable residence and/or program

(2) Family decided against admission or service no longer desired

(3) Other resources provided making admission no longer necessary

(4) Not in service area (or moved)

(5) No vacancy (but put on waiting list)

(6) Client capable of functioning in community

(7) No appropriate program available at Clover Bottom Developmental Center

That admission procedure, Diagnostic and Evaluation Center Process, includes various stages including Intake with Preliminary Service, Evaluation, Post Evaluation and Service, and Case Transfer or Closure. That all requests are supposed to be directed to the Diagnostic and Evaluation Services Division. That requests are by telephone, letter, or direct inquiry; and may be by the client, his family, or a professional or agency with whom he is involved. That to provide any service, an application has to be completed and signed by the appropriate person. That person can receive outpatient services without a complete evaluation, but a person cannot be admitted without a complete evaluation. That to proceed with any evaluation a signed application (by client or family) is necessary to request the service.

That each intake is handled in the following manner:

1. Basic data secured, recorded, and case responsible person designated. An intake sheet is completed which includes name of client, birthdate, county; referral source and date; family and other resource; problem description and service requested; date and action taken. This sheet is completed by the secretary and/or intake worker.

2. Client's name is entered in the statistical record with the assigned worker. An intake worker is assigned on a rotating basis. Each worker is responsible for intake approxi-

mately one week per month. Social workers are primary intake workers, though psychologists are at times assigned when the request is for psychological only; or psychological and medical only.

3. If the application was not the initial source of referral, an application is sent for completion by the family/client. There are currently several parts which are sent.

   (A) "Descriptive Application To a Tennessee Department of Mental Health Hospital and School for the Mentally Retarded" (12 pages)

   (B) "Continuation of Application" (1 page)

   (C) Developmental Check List

   (D) "Authorization to Release Medical Data"

   (E) When appropriate, "Authorization to Release Evaluation Data"

4. When application is complete, relevant data is requested from professionals and agencies from whom the client has received evaluation, treatment, counseling or other programming.

5. Initial counseling with the family and/or the applicant regardless of level of retardation and consideration of alternatives to institutionalization is included at intake, as well as throughout the process.

   (a) Other community resources (outpatient)

   (b) Other Outpatient (CBDC) resources

   (c) Short-term admission (respite or training)

   (d) Alternative residential placements (private)

   (e) Need for partial or complete evaluation

   (f) An explanation regarding the admission process, and the probable lengthy waiting list for regular admission is given.

6. As data is returned and as much as possible after a home visit by the intake worker and possibly other staff, the case is written for screening. The summary is distributed in advance to the team members with requests/recommendations. That when admission is requested and the client meets the residency and retardation criteria, a complete evaluation is always approved.

That after review by the team in screening and an evaluation is approved, it is placed on the schedule. That the client/family is sent an appointment letter with the explanation that the evaluation is to begin at 8:15 and it will take all day; that the client is not being admitted that day. The name and discipline of the evaluators is given in the letter. The family is asked to notify Clover Bottom, should they, for any reason, need to cancel the appointment. That a copy of the letter is usually sent to the referral source, as they are usually an advocate and involved in services for the client. If the referral source is a professional advocate, he is at times invited to attend, and participate at the time of the staff conference. That on evaluation day the receptionist informs the social worker of the the arrival of the client. That the social worker usually coordinates the evaluation day, but is assisted by the receptionist, and in some cases a volunteer who is assigned to D & E. That an explanation is reviewed regarding activities for the day in which the parents and the child or adult client are interviewed and the client examined. That the team completes test to determine the diagnosis, level of functioning, social conditions, training potential and program needs. That the client and family are asked what service(s) they want or need, what they see as the problem(s), and what their knowledge is of programs. That the evaluation schedule includes seeing the social worker and psychologist, and the physician and nurse in the morning. That the psychologist sees the client while the social worker sees the parents and vice versa. That

the physician and nurse see the client together and talk with the parents. That in many cases the nurse and/or other staff will have made a home visit and assessment prior to the evaluation day. That during the afternoon the client and family are seen by Speech and Hearing (when part of the evaluation), sees the dentist, completes lab work, and is interviewed by Reimbursement staff. That returning appointments might be made for special lab work or speciality clinics.

That evaluation day the family and client receive some, though limited interpretation of possible program recommendations, as the evaluation and recommendations are the result of team discussion and decision. That it also must be noted that the enactment of the program recommendations is contingent upon the choice and will of the client. That in essence, a "contract" is established between the client, family, and staff. That the client always has the option to decline the recommended service. That if he is underage but capable of understanding, the staff relates to him and gives him some interpretation, but the ultimate responsibility of action is seen to be the right of the parents.

That evaluation center staff makes every effort to provide a dynamic and quality evaluation and program plan. That the client is seen to have moral and legal rights to be respected and involved in his own life plans and programming. That the parents are also noted to have the same rights. That there are cases in which the assessed needs and rights of one may differ in the interpretation and concept by the family, by the client, and even by the staff. That though the family is important, the primary consideration and the most important person involved is the client. That the staff considers the family but makes recommendations to the best interest of the client, even if it conflicts with the family's desires.

That an interpretative interview is usually recommended in staffing conference. Team participants are selected by the team. The decision is also reached to interpret to the family, to the client, or both. That a case responsible person is designated to coordinate arrangements for the interpretative and short-term follow-up.

That interpretative interviews are held prior to referring clients to the admission board for regular admission. That if the client/family wants admission and the board approves it, they still have the option to decline.