**Kevin BARTLEY et al.**

**v.**

**Jack B. KREMENS, Individually and as Hospital Director of Haverford State Hospital, et al.**

**Civ. A. No. 72–2272.**

United States District Court, E. D. Pennsylvania.

July 24, 1975.

Stay Granted Dec. 15, 1975.

See 96 S.Ct. 558.

---

David Ferleger, Philadelphia, Pa., for plaintiffs.

Barry A. Roth, Deputy Atty. Gen., Harrisburg, Pa., for defendants.

Before GIBBONS, Circuit Judge, and HUYETT and BRODERICK, District Judges.

## OPINION AND ORDER

HUYETT, District Judge.

Plaintiffs have filed this class action [1] on behalf of the named plaintiffs and all persons eighteen years of age or younger who have been, are, or may be admitted or committed to mental health facilities in Pennsylvania under the Pennsylvania Mental Health and Mental Retardation Act (Act). 50 P.S. §§ 4402 and 4403 (§§ 402 and 403).[2] Invoking 28 U.

---

1. On April 29, 1974, we ordered that this action be maintained as a class action but left open the possibility that the definition of the class set out in the text might be amended or altered before the decision on the merits. We now find that this definition of the class is appropriate. We note that this action concerns children who allegedly are mentally ill as well as children who allegedly are mentally retarded.

2. Section 402 of the Pennsylvania Mental Health and Mental Retardation Act of 1966 provides in part:

Section 402. Voluntary admission; application, examination and acceptance; duration of admission.

(a) Application for voluntary admission to a facility for examination, treatment and care may be made by:

(1) Any person over eighteen years of age.

(2) A parent, guardian or individual standing in loco parentis to the person to be admitted, if such person is eighteen years of age or younger.

(b) When an application is made, the director of the facility shall cause an examination to be made. If it is determined that the person named in the application is in need of care or observation, he may be admitted.

(c) Except where application has been made under the provisions of Section 402(a)(2) and the person admitted is still eighteen years of age or younger, any person voluntarily admitted shall be free to withdraw at any time. Where application has been made under the provisions of Section 402(a)(2), only the applicant or his successor shall be free to withdraw the admitted person so long as the admitted person is eighteen years of age or younger.

Section 403 of the Pennsylvania Mental Health and Mental Retardation Act of 1966 provides in part:

Section 403. Voluntary commitment; application, examination and acceptance; duration of commitment.

S.C. § 1331 and 1343(3) and 42 U.S.C. § 1983, plaintiffs ask us to declare §§ 402 and 403 unconstitutional and to enjoin their enforcement.[3]

Plaintiffs contend that in violation of the Fourteenth Amendment to the United States Constitution, they are being denied both due process of law and equal protection of law because Pennsylvania allows plaintiffs and their class to be detained—denied their liberty—in mental institutions without substantial procedural safeguards including the: (1) right to notice; (2) right to a pre-commitment hearing; (3) right to counsel and if indigent appointment of counsel; (4) right to present evidence on their own behalf; (5) right to subpoena witnesses and documents; (6) right to confront and cross-examine witnesses against them and those who wish to admit or commit them; (7) right to be involuntarily detained only upon a decision of a judicial officer; (8) right to be involuntarily detained only upon a decision that they are in need of treatment, care, or observation.[4] Plaintiffs also contend that the regulations supplementing §§ 402 and 403 do not cure these sections of their constitutional infirmities because they apply only to children 13 years of age or older, require no pre-commitment hearing, and designate no time by which a post-commitment hearing must be held.[5] In essence, plaintiffs

---

(a) Application for voluntary commitment to a facility for examination, treatment and care may be made by:

(1) Any person over eighteen years of age.

(2) A parent, guardian or individual standing in loco parentis to the person to be admitted, if such person is eighteen years of age or younger.

(b) The application shall be in writing, signed by the applicant in the presence of at least one witness. When an application is made, the director of the facility shall cause an examination to be made. If it is determined that the person named in the application is in need of care or observation, he shall be committed for a period not to exceed thirty days. Successive applications for continued voluntary commitment may be made for successive periods not to exceed thirty days each, so long as care or observation is necessary.

(c) No person voluntarily committed shall be detained for more than ten days after he has given written notice to the director of his intention or desire to leave the facility, or after the applicant or his successor has given written notice of intention or desire to remove the detained person.

3. Plaintiffs do not challenge either Section 405 or 406 of the Pennsylvania Mental Health and Mental Retardation Act of 1966. Section 405 permits involuntary detention of persons, regardless of age, under emergency conditions for no longer than 10 days. Section 406 permits involuntary commitment of persons upon petition to the state court of common pleas and after hearing and examination. The person to be committed is entitled to notice of hearing, the right to counsel, and the opportunity and right to present testimony and evidence in his or her behalf and to confront his or her accusers. The court may order outpatient or partial hospitalization instead of in-hospital commitment.

4. We are not presented with the issue of what standards are needed for commitment. For an analysis of this question see the recent opinion of J. Hoffman in *Commonwealth ex rel. Charles Finkin, Jr. v. Roop*, Pa.Super., 339 A.2d 764 (1975). Also see, *Bell v. Wayne County*, 384 F.Supp. 1085, 1095. (E.D.Mich.1974).

5. After plaintiffs filed this action the Department of Public Welfare, pursuant to Section 201(2) of the Pennsylvania Mental Health and Mental Retardation Act of 1966, *adopted additional procedural safeguards for* children admitted or committed to institutions pursuant to Sections 402 and 403. These regulations provide in part:

1. All juveniles aged 18 and younger to be admitted to an Institution must be referred from a recognized medical facility, Mental Health/Mental Retardation therapist or Mental Health Agency; however, mentally retarded juveniles may be referred by either a pediatrician, or general physician or psychologist;

2. This referral must be accomplished by a psychiatric evaluation and that report must indicate with specificity the reasons that the person requires institutional care; however, a medical or psychological evaluation may accompany the referral of a mentally retarded juvenile;

3. The Director of the Institution or his delegate, shall have conducted an independent examination of the proposed juvenile, and if his results disagree with the pro-

claim that the present procedures do not adequately assure against the mistaken commitment of children who are not mentally ill.

In support of their claim that §§ 402 and 403 are unconstitutional, plaintiffs have submitted brief summaries of the reasons for the commitment of the named plaintiffs and other members of their class to demonstrate that many decisions to commit involve factual determinations requiring substantial procedures to guard against wrongful or erroneous commitment. We rely for our findings on the summaries contained in the final pretrial order which have been stipulated to and on defendants' exhibit numbered eight (8).

The named plaintiffs were either admitted under § 402 or committed under § 403 to Haverford State Hospital.[6] Plaintiff M.W. was admitted to Haverford State Hospital under § 402(a)(2). His mother admitted him allegedly against his wishes when he was fifteen and on December 1, 1972, he informed agents and employees of defendant of his desire to leave Haverford State Hospital. Plaintiffs K.B., S.G. L.L., and V. M. were committed to Haverford State Hospital under § 403(a)(2). Plaintiff K.B. was fifteen when his mother com-

fessional's opinion, the Director, or his delegate shall discharge the juvenile;

4. The telephone number and address of the juvenile's parents or the person who is requesting admission for the juvenile must accompany the referral;

5. Within 24 hours after the juvenile's admission, every youth who is at least 13 years of age must receive written notification (which he signs) explaining his rights indicating that he will be given a status report periodically of his condition; that he can contact by telephone or by mail his parents or the person who requested his admission; and that he will be furnished with the number of counsel (Public Defender's number; Legal Services) that he can call for representation. An appropriate person shall explain this notice (attached);

6. In the event that a juvenile whose chronological age is 13 or older objects (either orally or in writing) to remaining in the Institution, the Director, or his delegate, if he feels it is necessary for the youth to remain, may continue the institutionalization for two business days during which time he shall notify the applicant and the referral unit so that either party may institute a 406 proceeding. During that same two-day period, the Director, or his delegate, shall notify the Public Defender's Office or notify Legal Services readily available of the juvenile's need for legal representation. If a 406 proceeding is begun during the two-day period, the juvenile shall remain institutionalized. If the applicant cannot be located and the Director, or his delegate, feels that the juvenile does not require institutionalization, the Director, or his delegate, shall direct the Base Service Unit to assume

responsibility of providing for the juvenile's aftercare. However, if the Director, or his delegate, feels that the juvenile requires institutionalization, he shall direct the Base Service Unit to file a 406 proceeding within two days after failure to locate the applicant;

7. The juvenile's counsel shall be furnished with the juvenile's evaluation from the referral unit, with a psychiatric evaluation from the Institution, and with a written report of the reasons to institutionalize the juvenile;

8. If the staff member of the facility giving notice to the patient determines that the patient is incapable of understanding the notification, it shall be written on the notification;

The regulations do not provide a time by which a commitment hearing must be held. The Attorney General of Pennsylvania assures us that in cases involving children at least 13 years of age, commitment hearings are scheduled within a short while after the child objects. With respect to children 12 years of age or younger, there is no requirement for a hearing, no less a designated time.

Defendants submit that these regulations were not adopted with an eye towards this litigation and that with or without them, Sections 402 and 403 are constitutional.

6. By stipulation Haverford State Hospital was withdrawn as a defendant. Haverford is a mental health "facility" under Section 102, 50 P.S. § 4102 of the Mental Health and Mental Retardation Act. It receives admissions and commitments of persons including persons eighteen years of age or younger admitted or committed under Sections 402 and 403.

mitted him against his wishes. He was and still is critical of some of the hospital's regulations and treatment practices. Plaintiff S.G. was seventeen when his father committed him allegedly against his wishes. Plaintiff L.L. was fifteen when her mother committed her allegedly against her wishes. Her difficulties in relating to her mother resulted in her commitment. Hospital records show that she threatened the lives of her mother and sister and that she has a personality disorder. Her parents are divorced and her father is remarried, living in Florida. At the time of her commitment and the time this action was filed, she would have preferred to have been with her father and when she is with him her behavior is excellent. Plaintiff V.M. was fourteen when her mother committed her allegedly against her wishes.

Members of plaintiffs' class have been institutionalized for various other reasons. Patient number 13,173, a moderately retarded 13 year old child, was institutionalized in Polk State Hospital because of very sudden, explosive, rage reactions during which he attacked others and of which he has no recollection. His behavior rather than his mental retardation was the primary obstacle to his return to the community. Patient number 13,212, an educable mongoloid boy with the capacity to participate in many educable and trainable activities and who can be helped by an active special elementary program in public schools, was institutionalized in Polk State Hospital for a 1 to 2 week period so that the other members of his family could go on a family vacation. Patient number 288, a mentally retarded child, was placed in Western State Hospital because of a poor family situation. The mother of the child did not get along well with the child, and the family was afraid that she would have another nervous breakdown if the child were not placed in Western State Hospital. Patient number 281, a mentally retarded child was placed in a state institution because she had become a management

problem to both her parents and the community. Patient number 15, a mentally retarded child, was placed in Western State Hospital because the child interfered with the routine of the household and disturbed family members. The placement was based on a fear that if the child remained in his home, the mother might break down, the marriage of the child's parents might end in separation, the father's health might fail, and an adolescent daughter might be pushed into a premature marriage to escape an unhappy home. Class members have also been committed to mental hospitals for running away, robbing a gas station, stealing in general, chasing and striking a girl, arson, delinquent behavior in general, truancy, physical ailments such as colitis and weight loss, school phobia, and drug overdose.

At the time this action was filed defendants were all Pennsylvania officials with specific duties under the Act. Defendant Jack B. Kremens as Hospital Director of Haverford State Hospital was charged under 50 P.S. §§ 4102 and 4203 with supervision and administration of Haverford State Hospital. It was to Kremens or his delegates that application for admission and commitment under §§ 402(b) and 403(b) of the Act had to be made. Defendant Helene Wohlgemuth as Secretary of Public Welfare of the Commonwealth of Pennsylvania (Secretary) had the power under 50 P.S. §§ 4201 and 4202(a) to enforce the Act, to make all regulations necessary and appropriate to the proper accomplishment of the Act, and to operate and assign functions to all state facilities. Defendant William B. Beach as the Deputy Secretary for Mental Health and Mental Retardation of the Department of Public Welfare of the Commonwealth of Pennsylvania had the general authority to supervise and regulate mental health facilities in Pennsylvania.

At the outset, defendants contend that since the purpose of the Act is to meet the child's needs through treatment and rehabilitation rather than to punish the

child by incarceration for what he has done, the requirements of due process do not apply to the institutionalizing of children under §§ 402 and 403.[7] Defendants proceed to argue that if we determine that due process applies, we should find that in light of Pennsylvania's interest in protecting the child, preserving the family unit, maintaining the rights of parents to the custody, care, and upbringing of their children, and protecting society, the present statutes and regulations satisfy any due process requirements. Finally, defendants argue that since under §§ 402 and 403 the parents, guardians ad litem, or persons standing in loco parentis must set into motion the commitment machinery, these persons effectively waive any due process rights of plaintiffs and their class.

## DISCUSSION

Under the constitutional guarantee of procedural due process, we have developed a system whereby a person who may be subjected to a grievous loss of liberty is entitled to adequate procedural safeguards. *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Generally, the state is required to provide substantial procedures when there is the possibility of erroneously and wrongfully depriving persons of their liberty by committing them to mental institutions. See, concurring Opinion of Chief Justice Burger in *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *Lynch v. Baxley*, 386 F.Supp. 378 (M.D. Ala.1974); *Lessard v. Schmidt*, D.C. Wis., 349 F.Supp. 1078, remanded, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974), redecided 379 F.Supp. 1376 (1974), remanded 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975); *Dixon v. Attorney General Commonwealth of Pennsylvania*, 325 F.Supp. 966 (M.D. Pa.1971). These safeguards attempt to protect persons from an arbitrary or er-

7. A number of defendants in similar cases have raised this argument. In *In re Gault*, 387 U.S. 1, 21, 87 S.Ct. 1428, 1440, 18 L. Ed.2d 527 (1966) defendants claimed that juveniles obtain benefits from the informal juvenile procedures which more than offset the disadvantages of denying them the substance of normal due process. The Court rejected this argument holding:
 observance of due process standards, intelligently and not ruthlessly administered, will not compel the States to abandon or displace any of the substantive benefits of the juvenile process.
 In *Denton v. Commonwealth*, 383 S.W.2d 681 (Ky.1964) cited approvingly by Judge Biggs in *Dixon v. Attorney General of Pennsylvania*, 325 F.Supp. 966, 972 (M.D.Pa.1971), the court also rejected this argument holding that commitment procedures should be the same in civil commitment proceedings as they are in criminal proceedings. Responding to this same argument, Judge Biggs in *Dixon* stated: "We are unimpressed by the parens patriae argument and strong courts have not been persuaded by it." (citations omitted). In *Holm v. State*, 404 P.2d 740, 742 (Wyo.1965) the Wyoming Supreme Court held:
 No matter how commendable the motives back of legislation for the mentally ill may be, it still remains the fundamental law of the land that a person is not to be deprived of his liberty—whether by involun-

tary hospitalization or some other kind of incarceration—without due process of law. In *Heryford v. Parker*, 396 F.2d 393 (10 Cir. 1968) the court held that even if the institutionalizing of children is for rehabilitation, the constitutional safeguards of due process must be observed. The court in *Lessard v. Schmidt*, 349 F.Supp. 1078 (E.D. Wis.1972) was faced with the argument that due process procedures should be relaxed because of a subsequent right to treatment and because the commitment proceedings were civil in nature. After examining the effect civil commitment may have on those adjudged mentally ill, the court rejected these arguments and held that all persons 18 years of age or older being held pursuant to any emergency, temporary, or permanent commitment provision of the Wisconsin involuntary commitment statute, were entitled to substantial procedural safeguards. *Saville v. Treadway*, 404 F.Supp. 430 (M.D.Tenn. 1974) presented a challenge to a Tennessee Statute which permitted the "voluntary" commitment of juveniles by a parent, guardian, or person having legal custody of a mentally retarded minor. While recognizing the services furnished to mentally retarded children by the state, and the efforts in mental rehabilitation of the state, the court held that "where individual liberty is at stake . . . it is absolutely essential that such confinement be preceded by adequate procedural safeguards."

roneous deprivation of liberty or property, whether that deprivation be imposed for benevolent or punitive reasons. They are "our best instruments for the distillation and evaluation of essential facts from the conflicting welter of data that life and our adversary methods present." They "enhance the possibility that truth will emerge from the confrontations of opposing versions and conflicting data." *In re Gault*, 387 U.S. 1, 21, 87 S.Ct. 1428, 1440, 18 L.Ed.2d 527 (1966). As Mr. Justice Frankfurter has said: "The history of American freedom is, in no small measure, the history of procedure." *Malinski v. New York*, 324 U.S. 401, 414, 65 S.Ct. 781, 787, 89 L.Ed. 1029 (1945) (separate opinion) cited by the majority in *In re Gault*, 387 U.S. at 21, 87 S.Ct. 1428. If we are to preserve our traditional liberty we must scrutinize with care any claim that it is being arbitrarily denied.

■ In deciding whether the requirements of due process apply in any given case, the threshold question is whether the interest of the complaining party is within the contemplation of the liberty or property language of the Fourteenth Amendment. *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1971). The particular question here is whether or not a child's interest in not being institutionalized under §§ 402 and 403 is safeguarded by the Fourteenth Amendment. Defendants would have us find that because Pennsylvania is acting as parens patriae and not as an adversary, and because the admission and commitment proceedings are civil, not criminal, in nature, plaintiffs and their class may not complain of the deprivation of procedures available in criminal cases. Such a finding would ignore that the child is involuntarily removed from his home and familiar surroundings and is committed to an institution where "[he] suddenly faces the regimented routine of ward life and daily confrontation with state employees, however capable, rather than family and friends." *In re Ballay*, 157 U.S.App.D. C. 59, 482 F.2d 648, 669 (1973). As the Court of Appeals for the Tenth Circuit noted in *Heryford v. Parker*, 396 F.2d 393, 396 (1968):

> It matters not whether the proceedings be labeled "civil" or "criminal" or whether the subject matter be mental instability or juvenile delinquency. It is the likelihood of involuntary incarceration—whether for punishment as an adult for a crime, rehabilitation as a juvenile for delinquency, or treatment and training as a feeble-minded or mental incompetent—which commands observance of the constitutional safeguards of due process.

Defendants' contention also ignores the stigma associated with civil commitment which some commentators and courts have noted may render civil commitment a more lasting abridgement of personal freedom than imprisonment for commission of a crime.[8] The child who faces

---

8. Loss of liberty is in issue not only when a person is physically confined. The Due Process Clause also affords protection "where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971) ; *Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) ; *Goss v. Lopez*, 419 U.S. 565, 95 S. Ct. 729, 42 L.Ed.2d 725 (1975) ; *Donaldson v. O'Connor*, 493 F.2d 507, 520 (5 Cir. 1974), vacated and remanded *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975).

While we hope that society is moving in the direction of viewing mental illness in the same light as physical illness, we cannot ignore the reality that many in our society view mental illness with disdain or apprehension. See *In re Ballay*, 157 U.S.App.D.C. 59, 482 F.2d 648, 668 (1973) where the court noted that, "[e]ven accepting recent medical advances, current studies clearly indicate the fallacy of contending that most people view mental illness as a disease similar to any physical ailment of the body" and that it could not "ignore the striking example of this attitude displayed by news stories and public reaction to disclosures made by a recent vice-presidential aspirant." In *Penn-*

the possibility of being physically confined for an indeterminate period with all of the ramifications of such confinement clearly has an interest within the contemplation of the liberty and property language of the Fourteenth Amendment.

Having decided that due process applies, we are left with the questions of what process is due, *Morrissey v. Brewer supra*, 408 U.S. at 481, 92 S.Ct. 2593 and whether this process may effectively be waived by plaintiffs' parents, guardians ad litem, or persons standing in loco parentis.[9] Before discussing the process due, we shall first consider whether or not parents, guardians ad litem, or persons standing in loco parentis may effectively waive the personal rights of children, since such a finding obviates the need to decide whether the present procedure violates the constitutional right of plaintiffs to procedural due process. The question is both difficult and unique. Viewing the issue as whether or not a parent may effectively waive personal rights of a child when the child objects to the waiver creates a confrontation between a liberty interest of plaintiffs we find constitutionally protected and the consistently recognized authority of parents to direct the rearing of their children. *Ginsberg v. New York*, 390 U.S. 629, 639, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).

■■ We presume that in most instances parents, proceeding in utmost good faith, acting for the child, in the child's best interests, properly guide, protect, and control their children. In *Wisconsin v. Yoder*, 406 U.S. 205, 231, 232, 92 S.Ct. 1526, 1541, 32 L.Ed.2d 15 (1971) the Supreme Court, stating that it was not determining the proper reconciliation of possibly competing interests of parents, children, and the state, noted that:

> The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.

Also see, Justice Stewart's concurring opinion at 237, 92 S.Ct. 1526. We are not unmindful of this tradition and its importance to the structure of our society, *Ginsberg*, 390 U.S. at 639, 88 S.Ct. 1274, and if we could find that in all instances parents act in the best interest of their children, we might also find that parents may waive constitutional rights of their children. Unfortunately, as such a graphic example as parental child abuse illustrates,[10] this is not the case.[11] In deciding to institutionalize their children, parents, as well as guardians ad litem or persons standing in loco

sylvania Association for Retarded Children v. Commonwealth of Pennsylvania, 343 F. Supp. 279, 293 (E.D.Pa.1972) Judge Masterson, writing for the three judge court, held that in light of *Wisconsin v. Constantineau*, supra, due process requires a hearing before retarded children may be denied a public education because of the stigma which our society unfortunately attaches to the label of mental retardation.

9. As yet, the Supreme Court has not decided whether a child's parent, acting on behalf of the child, may effectively waive constitutional rights of the child. In *Heryford v. Parker*, supra, the court, in holding that the Due Process Clause applies to an involuntary civil commitment procedure, recognized that special problems may arise with respect to the effective waiver of rights by minors and mentally deficient persons. Finding that

there was no express attempt to make such a waiver, the court did not decide the issue.

10. See Memorandum and Order of Judge Urbom filed June 4, 1974, in *Horacek, etc. v. Exon et al.*, 354 F.Supp. 71 (D.C.Neb.1974). The claim before Judge Urbom was that the named plaintiffs were in a state hospital because their parents put them there. Responding to the argument that plaintiffs were in the hospital voluntarily because their parents placed them there, Judge Urbom held that "parents cannot deprive their children of constitutional rights—rights of the children vis-a-vis the state."

11. Dissenting in *Kent v. United States*, 130 U.S.App.D.C. 343, 401 F.2d 408, 416, n. 4 (1968) the now Chief Justice Burger noted:
Lawmakers in recent years have been sensitive to the need to make civil commit-

parentis, may at times be acting against the interests of their children. With this in mind we must agree with Judge Judd in *New York State Association for Retarded Children*, 357 F.Supp. 752, 762 (E.D.N.Y.1973) that, "in the absence of evidence that the child's interests have been fully considered," parents may not effectively waive personal constitutional rights of their children.[12]

■ Remaining is the question of what process is due. Due process is flexible in that a determination of what process is due cannot be made without an evaluation of "the precise nature of the government function involved as well as of the private interest that has been affected by government action." *Cafeteria Workers Union v. McElroy*, 367 U. S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed. 2d 1230 (1961). At a minimum, it requires that "deprivation of . . . liberty . . . by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case,"[13] but the formalities of the procedure however, "the timing and content of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved."[14] Because courts cannot determine what process is due without evaluating the competing interests, the content of due process shifts as the interests shift;

"[t]he required degree of procedural safeguards varies directly with the importance of the private interest affected and the need for and usefulness of the particular safeguard in the given circumstances and inversely with the burden and any other adverse consequences of affording it."[15]

As previously discussed, plaintiffs' interest in being free from the wrongful and unwarranted deprivation of their liberty is substantial and they argue that the present procedure does not adequately protect this interest. The state's interests are threefold. It has an interest in the mental health of children (parens patriae), an interest in preserving the family unit and maintaining parental authority over children, and an interest in confining, for the protection of society, those persons who pose significant danger to the community (police power). The state has decided that its interests require a relaxed, informal procedure, and it argues that a more formal procedure will substantially interfere with its interests. To strike a proper balance between the competing interests of plaintiffs and the state, we shall analyze them in the context of each procedural right of which plaintiffs claim they are being deprived. This will give us the content of the process which, at a minimum, is due before plaintiffs may be institutionalized for treatment.[16]

ment difficult, recognizing the dangers of relatives "farming" out their kindred into mental institutions for motives not always worthy.

In *New York State Association for Retarded Children, Inc. v. Rockefeller*, 357 F.Supp. 752, 762 (E.D.N.Y.1973) the court stated: [t]here may be a fundamental conflict of interest between a parent who is ready to avoid the responsibility of caring for an abnormal child, and the best interests of the child. Murdock, [Civil Rights of the Mentally Retarded: Some Critical Issues], 48 Notre Dame Lawyer at 139–143.

12. This finding does not mean that when considering whether or not to institutionalize a child, the state should ignore the opinions and observations of the child's parents. Rather the committing authorities should listen carefully to parents who live with and

observe the child on a daily basis for they very likely have invaluable information concerning their child.

13. *Goss v. Lopez*, 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975) citing *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

14. *Goss v. Lopez*, 419 U.S. at 579, 95 S.Ct. at 738 citing *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); *Morrissey v. Brewer, supra*, 408 U.S. at 481, 92 S.Ct. 2593.

15. See, Friendly, J. "Some Kind of Hearing", 123 U.Pa.L.Rev. 1267, 1278 (1975).

16. As we have already noted, due process is flexible; the Constitution mandates no specific code of procedures. We are aware of the problems facing courts when they at-

## PRE–COMMITMENT HEARING

█ A decision to institutionalize a child is often a difficult yet necessary decision for a child's parent to make. It is generally pursued only after all other alternatives have proven futile. The state has an interest in seeing that a procedural system will not deter parents, already faced with this difficult decision, from attempting to institutionalize children who are in need of treatment only mental institutions can provide. Further, to protect society and the individual child, the state has an interest in the immediate detention of children who may be dangerous to themselves or others. See, *Lessard v. Schmidt,* at 1092; Developments in the Law—Civil Commitment of the Mentally Ill, 87 Harv.L. Rev. 1190, 1275 (1974).

█ Balancing these substantial interests of the state with that of the child, we find that plaintiffs are not entitled to a pre-commitment hearing. As the Supreme Court has found with criminal cases, however, we find that, for the protection of the child, he is entitled to a hearing before an unbiased tribunal within a reasonable time to test whether there is probable cause to believe institutionalization is necessary. *McNabb v. United States,* 318 U.S. 332, 343–344, 63 S.Ct. 608, 87 L.Ed. 819 (1943); *Morrissey v. Brewer,* 408 U.S. at 489, 92 S.Ct. 2593 (1971); *Lynch v. Baxley,* at 388. In no event shall detention of the child in the absence of a probable cause hearing exceed seventy-two (72) hours from the date of the initial detention. See, *Lynch v. Baxley,* at 388; *Lessard v. Schmidt,* at 1091.[17]

## POST–COMMITMENT HEARING

█ If the conclusion of the preliminary hearing is that there is probable cause for believing the child needs institutionalization, the child is entitled to a post-commitment hearing before an unbiased tribunal on the need for commitment. A delay after the probable cause hearing is permissible. This delay will allow the child to adjust to his new surroundings and will allow both the state and the child time to prepare for the post-commitment hearing to come. It will also allow the state time to examine and diagnose the child adequately. These reasons do not, however, justify a prolonged period of confinement without a final determination on the need for institutionalization and should not exceed a two-week period. A two-week period will afford all parties an opportunity to prepare adequately and properly their positions with hope of ascertaining that which is best for the child.[18]

### NOTICE

█ The opportunity to be heard is fundamental to due process of law. *Grannis v. Ordean,* 234 U.S. 385, 394, 34 S.Ct. 779, 58 L.Ed. 1363 (1914). With-

---

tempt to fashion procedures protecting interests within the liberty and property language of the Fourteenth Amendment and we are sensitive to the claim that courts are "good at deciding cases, bad at drafting legislation . . . ." See, Friendly, J. "Some Kind of Hearing" supra. When presented with claims of constitutional dimension, however, we are constrained, when legislative bodies have failed to act, to find means of enforcing the constitutional rights being denied. Our action is not intended to pre-empt the state which is free to develop its own safeguards so long as they are as fully effective as those which we set out. *See Miranda v. Arizona,* 384 U.S. 436, 490, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Morrissey,* 408 U.S. at 490, 92 S.Ct. 2593.

17. In *Lynch v. Baxley,* at 388, the court held that emergency detention without a hearing on its appropriateness may not, in the absence of a probable cause hearing, exceed seven (7) days from the date of the initial detention. In *Lessard v. Schmidt,* at 1091, the court held that a probable cause hearing must be held within forty-eight (48) hours from the date of the initial detention.

18. Until the legislature acts to establish an unbiased tribunal to conduct the probable cause and final hearings the present facilities of the Commonwealth court system shall be used for these hearings.

out notice of that which is to transpire at a hearing "sufficiently in advance of any required hearings so that reasonable opportunity to prepare will be afforded," *In re Gault*, 387 U.S. at 33, 87 S.Ct. at 1446; *Lessard v. Schmidt*, at 1092; *Lynch v. Baxley*, at 388, the right to be heard has little significance. *Mullane v. Central Hanover Tr. Co.*, 339 U.S. at 314, 70 S.Ct. 652. To counterbalance this substantial interest of plaintiffs the state argues that by delaying treatment and traumatizing the child, the requirement of notice will aggravate the child's mental illness, interfere with the state's police power, and disrupt family harmony. In *Gault*, 387 U.S. at 21, 87 S.Ct. 1428, the Supreme Court refused to accept the state's fear of trauma as a justification for limited procedures. The Court stated that the observance of due process standards will not necessarily compel the states to abandon the substantive benefits of the juvenile process. Further, as Judge Tamm noted in *In re Ballay*, 157 U.S.App.D.C. 59, 482 F.2d 648, 664 (1973), the fear that added procedural requirements will produce trauma presupposes that the person who faces commitment is mentally ill. Likewise, while procedural safeguards assume that not all persons who face commitment need actually be committed, the argument that procedures will interfere with the state's police power and disrupt family harmony assumes that the child is dangerous to others and comes from a family in harmony.

Keeping in mind that due process assures against error, we find written notice required, including the date, time, and place of the hearing, and a statement of the grounds for the proposed commitment. See, *Lynch v. Baxley*, at 388; *Lessard v. Schmidt*, at 1092. Neither the state nor plaintiffs have an interest in committing to mental institutions children not in need of institutionalization. Notice should not shield children in need of institutionalization from commitment and treatment but rather should protect children not in need of institutionalization from wrongful commitment and improper deprivation of their liberty.[19]

## COUNSEL

 The state fears that assistance of counsel will make institutionalization proceedings adversarial adding to the delay in treatment of the child and increasing the danger of trauma already inflicted by notice and a hearing. Yet the spectre of this particular trauma pales beside the spectre of the trauma inflicted on a child erroneously committed.[20] Notice and the opportunity to be heard may be of little value without the assistance of counsel. *Argesinger v. Hamlin*, 407 U.S. 25, 31, 92 S. Ct. 2006, 32 L.Ed.2d 530 (1972); *Powell v. Alabama*, 287 U.S. 45, 68–69, 53 S.Ct.

19. Obviously this notice may be meaningless to some children. We, therefore, find that until some other procedure is established this notice shall be sent not only to the child but also to the Clerk of the Court with jurisdiction and shall be forwarded to the child's attorney. The child's attorney shall be in receipt of the notice at least forty-eight (48) hours prior to the initial hearing.

20. The possibility and danger of error is discussed by D. L. Rosenhan in "On Being Sane in Insane Places," 179 Science 250 (1973). The article describes an experiment in which eight sane persons gained admission to twelve different hospitals and behaved normally. Their sanity was never discovered. Not only was their sanity not detected, but the psychodiagnostic label placed on the individual patients was never removed. According to Professor Rosenhan this error apparently resulted from what statisticians call type two error—error resulting from a Doctor's inclination to call a healthy person sick rather than a sick person healthy because it is more dangerous to misdiagnose illness than health.

Rosenhan suggests that the initial labelings color others' perception of the patient and eventually the patient himself accepts the diagnosis, with all of its connotations and expectations, and behaves accordingly. He also notes that there is substantial evidence that attitudes towards the mentally ill are characterized by fear, hostility, aloofness, and dread.

55, 77 L.Ed. 158 (1932). A child whose liberty is in question "needs the assistance of counsel to cope with problems of law, to make skilled inquiry into the facts, to insist upon regularity of the proceedings, and to ascertain whether he has a defense and to prepare and submit it." *Gault,* 387 U.S. at 36, 87 S.Ct. at 1448. As the right to counsel applies to criminal cases, so it must apply during all significant stages of the commitment process, and plaintiffs must be informed of both their right to counsel and if indigent their right to appointment of free counsel. See, *In re Gault,* at 41, 87 S.Ct. 1428; *Heryford v. Parker,* at 397; *Dixon v. Attorney General,* at 966; *Lessard v. Schmidt,* at 1097; *Lynch v. Baxley,* at 389; *United States v. Wade,* 388 U.S. 218, 226–27, 87 S.Ct. 1926, 18 L. Ed.2d 1149 (1967); *In re Barnard,* 147 U.S.App.D.C. 302, 455 F.2d 1370, 1375–76 (1971); *Sarzan v. Gaughan,* 489 F.2d 1076, 1083–84 (1 Cir. 1973).

### PRESENCE OF PERSON

In *Specht v. United States,* 386 U.S. 605, 610, 87 S.Ct. 1209, 1212, 18 L.Ed.2d 326 (1967) the Supreme Court held that commitment proceedings under the Colorado Sex Offenders Act, whether denominated civil or criminal, are subject to the Due Process Clause of the Fourteenth Amendment and that due process requires that the person to be committed "be present with counsel, have an opportunity to be heard, be confronted with witnesses against him, have the right to cross-examine, and to offer evidence of his own. Also see, *Lynch v. Baxley,* at 394. In *Illinois v. Allen,* 397 U.S. 337, 342, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1969) the Court, rejecting the argument that the right to be present is absolute, held that the right of personally confronting witnesses may be lost by consent or at times even misconduct. Expanding this holding the *Lynch v. Baxley* court held that the right to be present may be knowingly and intelligently waived by persons faced with involuntary commitment or by adversary counsel acting in their behalf. This pro-cedure protects such persons' constitutional right to be present and to assist in protecting their interests, yet it recognizes that situations exist where the absence of such persons from commitment proceedings may serve their own best interests.

■ We adopt the *Lynch v. Baxley* procedure as appropriate for plaintiffs. Accordingly, we find that a child has a constitutional right to be present at all hearings concerning his proposed commitment. See, *McKiever v. Pennsylvania,* 403 U.S. 528, 543, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971). This right may be waived by the child, however, and the unbiased tribunal may accept such a waiver upon approval by the child's counsel and upon a finding that the child understands his rights and is competent to waive them. This right may also be waived by the child's attorney, and the unbiased tribunal may accept the waiver upon a finding that the child is too ill to attend the proceedings. See, *Lynch v. Baxley,* at 394.

### RIGHT TO JURY TRIAL

■ The Supreme Court in *Mc-Kiever v. Pennsylvania, supra,* noting that conscientious judges are able fact finders, held that while fundamental fairness requires notice, the rights to counsel, confrontation, and cross-examination, and notice of standard of proof, it does not require jury trials. We agree.

### STANDARD OF PROOF

That the factfinder may commit error is a risk of any litigation. *Speiser v. Randall,* 357 U.S. 513, 525–26, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). The standard of proof affects this risk for it instructs the factfinder on the degree of confidence society expects him to have in the correctness of his findings. See, Mr. Justice Harlan concurring in *In re Winship,* 397 U.S. 358, 370–71, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1969). In *Winship,* Justice Harlan suggests that setting the standard of proof for a particu-

lar category of adjudication reflects an assessment of the comparative social costs of erroneous factual determinations. He views the decision to apply a preponderance standard to suits between private parties for money damages as a decision that an erroneous verdict is no more serious for one party than for the other. He finds the standard of proof beyond a reasonable doubt required in the institutionalization of a child for delinquency because the social disutility of committing an innocent child—subjecting him to a complete loss of his personal liberty—outweighs the social disutility of committing error in his favor.[21]

 Following this analysis, balancing the impact of an erroneous decision to commit a person with an erroneous decision to release a person, and taking into consideration the nature of the proceedings, the *Lynch v. Baxley* court held:

> Because the stigmatization and loss of liberty attendant upon forced confinement are of the most profound consequence to the individual affected, due process demands that he be subjected to such disabilities only if the necessity for his commitment is proved by evidence having the highest degree of certitude reasonably attainable in view of the nature of the matter at issue. In a civil commitment proceeding, the questions involved are the primarily subjective ones of the subject's mental condition and the likelihood that he will be dangerous in the future. Such subjective determinations cannot ordinarily be made with the same degree of certainty that might be achieved where purely objective facts and occurrences are at issue. Consequently, the trier of fact must be persuaded by clear, unequivocal, and convincing evidence that the subject of the hearing is in need of confinement under the minimum standards for commitment herein enumerated.

We agree with this holding and find that the factfinder, in a hearing on commitment of a child, must apply the standard of clear and convincing proof as opposed to the standards of beyond a reasonable doubt and preponderance of the evidence. Applying a preponderance standard creates too great a risk of erroneous commitment, wrongfully depriving a child of his interest in liberty, an interest of "transcending value,"[22] and, given the subjectivity and "relatively

---

21. Mr. Justice Harlan recognizes that in a judicial proceeding in which there is a dispute about the facts, all the factfinder can acquire is a belief of what probably happened. Mr. Justice White in *Goss v. Lopez*, 419 U.S. 565, 580, 95 S.Ct. 729, 739, 42 L. Ed.2d 725 (1975) also recognized the possibilities of error when he noted that:

Disciplinarians, although proceeding in utmost good faith, frequently act on the reports and advice of others; and the controlling facts and the nature of the conduct under challenge are often disputed. The risk of error is not at all trivial, and it should be guarded against if that may be done without prohibitive cost or interference with the educational process.

In discussing the possibilities of erroneous psychiatric diagnoses Rosenhan, in "On Being Sane in Insane Places," *supra*, raises several poignant questions which illustrate some of the problems in this area including:

How many people, one wonders, are sane but not recognized as such in our psychiatric institutions? How many have been needlessly stripped of their privileges of citizenship, from the right to vote and drive to that of handling their own accounts? How many have feigned insanity in order to avoid the criminal consequences of their behavior, and, conversely, how many would rather stand trial than live indeterminably in a psychiatric hospital—but are wrongly thought to be mentally ill? How many have been stigmatized by well-intentioned but nevertheless erroneous, diagnoses? On the last point recall again that a "type 2 error" in psychiatric diagnosis *does* not have the same consequences it does in medical diagnosis. A diagnosis of cancer that has been found to be in error is cause for celebration. But psychiatric diagnoses are rarely found to be in error. The label sticks, a mark of inadequacy forever.

These problems are similar to the problems discussed by Mr. Justice Harlan in *Winship* and Mr. Justice White in *Goss v. Lopez*.

22. *Speiser v. Randall*, 357 U.S. 513, 525, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958).

undeveloped state of psychiatry as a predictive science,"[23] requiring proof beyond a reasonable doubt creates too great a risk of erroneously releasing children in need of institutionalization.

## RIGHTS AT THE COMMITMENT HEARING

■ Due process requires that before a decision to commit, an adult be given the opportunity to confront and to cross-examine witnesses against him, *Specht v. Patterson,* 386 U.S. at 610, 87 S.Ct. 1209; *Lynch v. Baxley* at 394, offer evidence in his own behalf, *Specht v. Patterson* 386 U.S. at 610, 87 S.Ct. 1209, and offer testimony of witnesses, *Lynch v. Baxley* at 394, citing *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).[24] While formalizing commitment procedures, these rights do not require the state to abandon the substantive benefits it presently hopes to achieve through treatment and rehabilitation. We commend the steps the state has taken in the interest of the mental health of children in need of institutionalization but, because of the tremendous personal as well as societal loss error might cause, we find that in addi-

tion to the rights previously discussed, the rights to confront and to cross-examine witnesses against him, to offer evidence in his own behalf and to offer testimony of witnesses are required before a decision to commit a child is made.[25]

■ To summarize, then, we have found that before they may be institutionalized plaintiffs and others of their class are entitled to (1) a probable cause hearing within seventy-two (72) hours from the date of their initial detention; (2) a post-commitment hearing within two (2) weeks from the date of their initial detention; (3) written notice, including the date, time, and place of the hearing, and a statement of the grounds for the proposed commitment; (4) counsel at all significant stages of the commitment process and if indigent the right to appointment of free counsel; (5) be present at all hearings concerning their proposed commitment; (6) a finding by clear and convincing proof that they are in need of institutionalization; (7) the rights to confront and to cross-examine witnesses against them, to offer evidence in their own behalf, and to offer testimony of witnesses.[26] Accordingly, we declare the

23. Note, Developments in the Law, Civil Commitment of the Mentally Ill. 87 Harv. L.Rev. 1190, 1302 (1974).

24. In *Morrissey v. Brewer, supra,* the Supreme Court held that due process requires certain minimum procedures before parole can finally be revoked. These procedures include the opportunity to be heard in person and to present witnesses and documentary evidence, and the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation). Noting that these procedures are essential in criminal trials, where a person may be subjected to the most serious deprivation, and cases where a person may lose his job in society, the Supreme Court in *Wolff, supra,* held that because of the unique problems of penal institutions the determination of whether prisoners are entitled to these rights is best left to the discretion of the officials of the prisons.

25. In support of their position plaintiffs submitted memoranda of law outlining the sub-

stantial procedural safeguards which they contend they are being denied. They briefly mention the contention that plaintiffs should have the right to remain silent. Against this claim we must balance the practical problems plaintiffs' silence may have on psychiatric evaluation almost always needed before plaintiffs may be institutionalized. In view of these potential problems and the limited discussion of the issue in this case, we think that it would be inappropriate to decide this issue at this time.

26. We neither intend nor expect that all of these procedures will be required every time an attempt to institutionalize a child is made. As we found with respect to the right of the child to be present at all hearings concerning his proposed commitment, we find that, excepting the right to notice and counsel, any or all of these rights may be waived by the child and the unbiased tribunal may accept such a waiver upon approval by the child's counsel and upon a finding that the child understands his rights and is competent to waive them. Because

**1054**

pertinent portions of Sections 402 and 403 unconstitutional on their face and as they apply to plaintiffs and others of their class, and we enjoin the enforcement of such portions.[27]

The foregoing is deemed to constitute findings of fact and conclusions of law as required by F.R.Civ.P. 52(a).

BRODERICK, District Judge (dissenting).

It appears to me that the majority opinion has prescribed "an overdose" of due process which could prove fatal to the voluntary commitment of children for in-patient treatment for mental or emotional disorders. The majority opinion declares unconstitutional §§ 402 and 403 of the Pennsylvania Mental Health and Mental Retardation Act which provides that parents may make application for voluntary admission and commitment of their child age 18 or younger to a facility for examination, treatment and care. The due process procedure prescribed by the majority opinion for all voluntary admissions and commitments of juveniles 18 years of age and younger is as follows: (1) a probable cause hearing within 72 hours from the time of their initial detention; (2) a post-commitment hearing within 2 weeks of their initial detention; (3) written

notice to the child stating the time and place of the hearing and the grounds for the proposed commitment. The notice must also be sent to the child's attorney; (4) counsel at all significant stages of the commitment process and, if indigent, the right to the appointment of free counsel; (5) the right of the child to be present at all hearings concerning his proposed commitment; (6) a finding, by "clear and convincing proof", that the child is in need of institutionalization; and (7) the right to confront and to cross-examine witnesses, and to offer evidence on his own behalf.

The Pennsylvania Mental Health and Mental Retardation Act and the regulations promulgated thereunder provide for the voluntary admission[1] or commitment[2] of persons eighteen years of age or younger by a parent, guardian or individual standing in loco parentis to the person to be admitted. It is this voluntary admission or commitment procedure which the majority has declared unconstitutional. In effect, the majority has declared that no voluntary commitment of children by their parents can meet the constitutional requirements of the Fourteenth Amendment.

Under the Pennsylvania Act and regulations, application for voluntary admission or commitment[3] to a facility may be

---

there may be situations where the child either does not understand his rights or is not competent to waive them, any or all of these rights may also be waived by the child's attorney and the unbiased tribunal may accept the waiver upon a finding that the waiver is appropriate.

27. Some courts have approached claims by children of constitutional deprivation by comparing the rights afforded adults with the rights afforded children and questioning whether there is a peculiar state interest justifying any disparity between them. See *State v. Koome*, 84 Wash.2d 901, 530 P.2d 260, 263 (1975). Authority for such an approach can be gleaned from the Supreme Court's statement in *In re Gault*, 387 U.S. at 29, 87 S.Ct. at 1445, that "So wide a gulf between the State's treatment of the adult and of the child requires a bridge sturdier than mere verbiage, and reasons more persuasive than cliche can provide." Since we

dispose of this case under the Due Process Clause we have no occasion to address the equal protection arguments directed at the disparate treatment of children and adults. Plaintiffs also claim they are being denied equal protection of the law since persons above the age of eighteen (18) may voluntarily admit or commit themselves to mental institutions and persons eighteen (18) years of age or younger may not. Plaintiffs, however, fail to allege that any of the named plaintiffs ever attempted voluntarily to admit or commit themselves or even that they wish to. Accordingly, we find that plaintiffs lack standing to present this claim.

1. 50 P.S. § 4402(a)(2).

2. 50 P.S. § 4403(a)(2).

3. The legislature chose to pass two distinct statutes, one of which deals with voluntary admissions to a facility while the other is concerned with voluntary commitments. Ap-

made by a parent, guardian or individual standing in loco parentis to the person to be admitted, if such person is eighteen years or younger.[4] In order to be admitted or committed to an institution, any person aged 18 and younger must first be referred from a recognized medical facility, Mental Health/Mental Retardation therapist or Mental Health Agency. Such referral must be accomplished by a psychiatric evaluation and a report which states with specificity the reasons that the child requires institutional care. After such referral, the director of the facility to which the parents seek to have their child admitted must then conduct an independent examination of the child in order to determine whether the child is in need of institutional care or observation.[5] If the director's independent examination disagrees with the referring professional's opinion, the child cannot be institutionalized. In the case of a voluntary commitment under § 403 of the Act, an acceptance for commitment may not exceed thirty days without a successive application for continued voluntary commitment for an additional thirty day period.[6] In the case of juveniles 13 years of age and older, within 24 hours of admission to the institution, the juvenile must be given written notification which he signs and which is to be fully explained to him and which states that he will be furnished with counsel to represent him. Should a juvenile who is 13 years of age or older object, either orally or in writing, to remaining in the institution, the director, if he feels it is necessary for the youth to remain, may continue the institutionalization for two business days, during which time notification shall be made to the applicant and the referral unit so that either party may institute a § 406 proceeding, which is the statutorily required court hearing for an involuntary commitment. During that same two day period, the director must obtain counsel to represent the juvenile. The juvenile's counsel is then furnished with the evaluation of the juvenile by the referral unit, a psychiatric evaluation from the institution, and a written report of the reasons that the institution feels that institutionalization is required.[7]

The effect of the Act and the regulations promulgated thereunder is that two independent medical opinions must concur in a recommendation of institutionalization before a minor can be voluntarily admitted. In the case of juveniles 13 and over, upon their objection to remaining in the institution, future institutionalization must proceed pursuant to the civil court commitment provisions of the Act. (Section 406). Section 406 provides the procedure for an involuntary civil court commitment and requires the filing of a petition with the Court of Common Pleas, pursuant to which the Court issues a warrant requiring the allegedly ill person to be brought to Court for a hearing. Counsel appointed for the juvenile represents him at the hearing before the Court of Common Pleas. After the hearing, the Court may order an examination by two physicians or order commitment for a period not to exceed ten days for an examination, after which commitment may be ordered by the Court. Plaintiffs do not attack the constitutionality of the

---

parently, the main distinction in the two statutes is that under the later section dealing with voluntary commitments, the initial commitment is for a period not to exceed thirty days, with successive periods not to exceed thirty days each, so long as care or observation is necessary. The section providing for voluntary admissions contains no corresponding time limitation following admission to a facility.

4. 50 P.S. § 4402(a)(2) ; 50 P.S. § 4403(a)(2).

5. 50 P.S. § 4402(b) ; 50 P.S. § 4403(b).

6. 50 P.S. § 4403(b).

7. I agree with the majority that these regulations which provide for instituting a § 406 hearing do not provide for a period within which such a hearing shall be held following the objection of the child to remaining in the institution.

civil court commitments under § 406 of the Act which follow the above outlined procedure.

I do not take the position that children have no rights. I simply feel that the procedures outlined by the Pennsylvania Legislature, when balanced against the traditional rights of parents to control the rearing of their children, afford sufficient protection to the child. The present Act does not permit a parent who seeks to admit a child under § 402 or § 403 to simply hand over the child to the institution. Two psychiatrists must agree, after an examination, that the child is ın need of institutionalization. In the case of a voluntary commitment, a periodic review must be performed by the director every thirty days to determine whether continued institutionalization is necessary. And in the case of a juvenile thirteen years of age and older, the juvenile is entitled to a hearing with counsel concerning his need for institutionalization following his objection. The majority in this case holds that all children are constitutionally entitled to a similar type of hearing within two weeks of their institutionalization. The only group for which the present regulations have not provided a hearing subsequent to their being received in the institution are those children 12 years of age and under. Because of this alleged defect, the majority declares § 402 and § 403 unconstitutional.

It is now a well settled principle that "due process 'is an elusive concept', the content of which 'varies according to specific factual contexts.'" *Hannah v. Larche,* 363 U.S. 420, 442, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307 (1960); *Logan v. Arafeh,* 346 F.Supp. 1265, 1268 (D. Conn.1972).

[C]onsideration for which procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as the private interest that has been affected by government action. *Cafeteria and Restaurant Workers Union, Local 473, AFL–CIO v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961).

Due process of law does not require a hearing in every conceivable case of government impairment of private interest. *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

An evaluation of the competing interests involved in this case leads me to the conclusion that § 402 and § 403 of the Act and the regulations thereunder are constitutional on their face. Without minimizing the interest of a child 12 years and under to be free from a wrongful and unwarranted deprivation of his liberty, the traditional interest of the state in preserving the family unit and in maintaining parental control over their young children is such that the strict procedural due process requirements imposed by the majority holding as to "voluntary" commitments are not required by the Fourteenth Amendment.

The Supreme Court has repeatedly recognized and afforded great weight to the rights of parental control and custody of their children and has given due respect to the powerful role of the familial relationship in our democratic society. This substantial interest of parents undeniably warrants deference and, absent a powerful countervailing interest, warrants protection. It is plain that the interest of family integrity and the interests of parents in the care, custody and nurture of their children come to the court with a momentum deserving of respect. *Kovacs v. Cooper,* 336 U.S. 77, 95, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (Frankfurter, J., concurring).

As the Supreme Court stated in *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972):

The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed "essential," *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), "basic civil rights of

man," *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942), and "[r]ights far more previous . . . than property rights," *May v. Anderson*, 345 U.S. 528, 533, 73 S.Ct. 840, 843, 97 L.Ed. 1221 (1953). "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, *Meyer v. Nebraska, supra*, 262 U.S. at 399, 43 S.Ct. at 626, the Equal Protection Clause of the Fourteenth Amendment, *Skinner v. Oklahoma, supra*, 316 U.S., at 541, 62 S.Ct. at 1113, and the Ninth Amendment, *Griswold v. Connecticut*, 381 U. S. 479, 496, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring).

The authorities cited above make it clear that the parents' interest in directing the upbringing of their children is cognizable and substantial. *Stanley, supra* at 652, 92 S.Ct. 1208. Those who nurture the child and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations. *Pierce v. Society of the Sisters of the Holy Names, etc.*, 268 U.S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). The parents' claim to authority in their own household to direct the rearing of their children has been termed "basic in the structure of our society." *Ginsberg v. State of New York*, 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968). In *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the Supreme Court stated at 232, 92 S.Ct. at 1541:

> The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.

As Chief Judge Bazelon of the District of Columbia Court of Appeals has stated:

> [T]he family is the most effective child-developing agent around, when it wants to be and can be. Out of the plethora of studies of day care and early intervention, one thing stands out: a child needs most a family—it is there that he finds his roots and his education. Mothers and fathers who spend time with their child are better at it than are most organized group care arrangements. David L. Bazelon, *Whose Needy Children?* University of Michigan Journal of Law Reform, vol. 8, 247.

Simply stated, it is my opinion that the present Act and the regulations thereunder which require two independent psychiatric evaluations recommending institutionalization before a parent can voluntarily have his child admitted for treatment or observation provides sufficient protection to the child against an unwarranted or unjustified institutionalization.

The record in this case demonstrates that most parents act in the best interests of their child when making the decision to voluntarily submit their child to institutional treatment. Indeed, those parents whose motives the majority opinion questions are few and far between. Children of the age of twelve and younger are at a stage of development when parents must have direct control over their care and treatment. Parents of such young children are best able to make a determination as to their child's needs, and their decision to seek institutional care and treatment for their child comes only after all other alternatives for treatment and care have been exhausted. To protect a child from being institutionalized when not in need of such care, the State has developed a system whereby the independent judgment of two experts, trained in this dif-

ficult area, must concur with the parents' decision.[8]

As the record in this case clearly reveals, the modern trend in the treatment of the mentally and emotionally ill and the retarded is to institutionalize for the least amount of time and only when all else has failed. The majority opinion expressed concern as to the warehousing of children which might result from the voluntary commitment procedure. However, since the recent opinion of the Supreme Court in *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), this fear should be dissipated by the Court's holding that a state cannot constitutionally confine a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends. I find that the procedures set forth by the majority which require two hearings with counsel appointed for the child, the confrontation and cross-examination of parents and the requirement of clear and convincing proof of the need of institutional care needlessly destroys the voluntary commitment procedure without affording any significant protection for the child. The adversary nature of the procedure which the majority requires will significantly increase the trauma which accompanies the institutionalization of sick children and will further serve to stigmatize the recipient of the court endorsed commitment. In my opinion, it retards society's progress of recent years in encouraging parents to seek treatment and care of a child in need of hospitalization for a mental or emotional disorder. It will likewise retard society's progress toward removing the stigma still associated by some with psychiatric care. The majority opinion discusses "the stigma associated with civil commitment", yet sets up a system

which makes civil commitment necessary. For years now, responsible leaders have been counseling the public that treatment for mental and emotional disorders should be as readily available and as readily acceptable as hospitalization for a tonsillectomy or appendectomy. It certainly will not encourage parents to seek hospitalization for a mentally or emotionally disturbed child when the parent learns that counsel will be appointed for the child and that there will be an adversary hearing at which parents will be subjected to cross-examination as to their motives for seeking hospitalization.

---

8. I am aware that courts in Nebraska and Tennessee have declared unconstitutional statutes which permit the voluntary institutionalization of children. *Horacek, etc. v. Exon et al.*, 354 F.Supp. 71 (D.C.Neb.1974). *Saville v. Treadway*, Civil Action No. 6969

(M.D.Tenn.1974). However, it is not apparent from reading the opinions in those cases whether both Nebraska and Tennessee provide a protective procedure similar to those provided for under the Pennsylvania statute and regulations.